### DR. R. B. WARREN v. THE STATE.

#### No. 1178.    Decided June 26, 1897.

**1.  Attempt to Commit Rape—Statutory Construction.**

We have no statute expressly declaring an attempt to commit rape to be an offense.  Penal Code, article 640, provides: "If it appear on the trial of an indictment for rape that the offense, though not committed, was attempted by the use of any of the means spoken of in articles 634, 635, and 636, but not such as to bring the offense within the definition of an assault with intent to commit rape, the jury may find the defendant guilty of an attempt to commit the offense and affix the punishment prescribed in article 608."  This statute specifically points out the manner, means, and method which must be intended by the accused in order to constitute the offense.

**2.  Same—Force.**

No person, in this State, can be guilty of an attempt to commit rape unless the proof shows that an attempt was made by the use of force, and the force intended to be used is that defined in article 634; that is, the force intended to be used must be reasonably calculated to overcome resistance, taking into consideration the relative strength of the parties and other circumstances of the case.  When the force used amounts to an assault, it ceases to be a mere attempt, and would be an assault to commit rape; for the two offenses have come together, the attempt has ceased, and the assault has taken its place.  Where force is actually used, then it is no longer a mere attempt.

**3.  Same—Age of, and Consent by, Female.**

In attempt to rape, the age of the female has nothing to do with the question, it being mainly a question as to the intended use of force.  The law requires that the accused intended the use of the force defined in article 634, and though the female was under the age of 15 years, this did not dispense with the necessity of proving such force.  And in this offense, the law presupposes that she was not consenting.  She could not, at the same time, resist and consent.  In this respect, the law of attempt to rape differs from the law of rape.

HENDERSON, Judge, while agreeing with the result reached, does not concur in some of the reasoning of the opinion.

APPEAL from the District Court of Smith.  Tried below before Hon. A. B. WATKINS, Special Judge.

Appeal from a conviction for an attempt to rape; penalty, seven years in the penitentiary.

The indictment contained two counts; the first alleging the rape of one Belle Beauchamp, a female under the age of 15 years; and the second, a rape of Belle Beauchamp by force, threats, and fraud, and without her consent.

The facts, substantially, as shown by the record, were:  That on Friday, March 6, 1896, the defendant, a physician, resided with his wife in the town of Bullard, Smith County, in a four-room house, fronting east, with an open hall running through the middle of it, east and west, and

a portico the width of the hall in front; two rooms on each side of the hall with a door from the hall opening into each. Situated about 100 yards in front of this house was the village schoolhouse, also fronting east. Belle Beauchamp, the prosecutrix, at the time of the alleged crime, was slightly under the age of 14, and was, and had been for the past five months, boarding with defendant and going to school; her father living some six miles from there, in the country. She slept in the same room with defendant and his wife, and a young man boarder occupied another room in the house. On the day the crime is alleged to have been committed, Mrs. Warren contemplating going in the country for an adopted child of defendant and herself, and so informed the prosecutrix. After the latter had gotten her dinner, about 12 o'clock, she went back to the schoolhouse, and the defendant, who was drinking, and had been on a protracted drunk, sent her word by Marvin Cole, a little boy going to the same school, to come to the house; that Mrs. Warren wanted to see her; and she came, somewhere between 12 and 1 o'clock. On entering the house, she passed into the hall from the front, and into Mrs. Warren's room, which was the front room on the right of the hall, going in. Not finding anyone, she came to the door of Mrs. Warren's room and saw defendant standing in the door of the opposite room. She then stepped out into the hall, and defendant took her by the arm and led her back into Mrs. Warren's room and sat down on the side of the bed, to the right of the door, with her, and asked her to have carnal intercourse with him. She did not go back to school that afternoon, and what took place between them is stated by her as follows:

"He pushed me over in a sitting position on the side of the bed; then he sat down by me and talked to me. He told me that all girls did the like of that, and kept on talking to me; told me it was not wrong, and kinder felt of me. He kinder shoved me over on my back crosswise the bed. He was trying to get my consent to have carnal intercourse with me. He did not do anything then. He repeated the words over, and I told him if he was going to do anything like that to get up and put the curtains down. He got up and went to put the curtains down, and I ran to the door and he caught me and led me back to the bed. He pulled me down sitting on the bed again, and Sallie Tarrant opened the door and poked her head in and saw him and me. Dr. Warren got up and kept holding me by the arm; door was not locked; was locked at one time. After Sallie stepped back, he threw me kinder on the bed. Kept trying to get my consent. He was sitting on the bed; kept sitting on the bed. Before Sallie Tarrant opened the door he had gotten about half way on me. He tried to unfasten my clothes in front—my bosom—but did not. Do not know why, unless because I was moving about too much. He took hold of my clothing and tried to get my clothes up, but did not get them farther up than just above my knees; I was pushing his hands, trying to push him off. Do not think he ever got fully on top of me. I remember the most important part of it, but not all. Do not know whether his pants were unbuttoned or not; I did not see them unbut-

toned or open. His feet and legs were on the floor, I suppose, when he was pulling my clothes up. He did not put his private parts in mine. Before Sallie opened the door he put his hand on my private part, but did not do so afterwards. He pulled me off the bed and caused me to stand up, when he reached over and bolted the door. Just after Sallie left he pushed me over on the bed and I remained in a sitting position; then I was not pushed across the bed any more. Do not know how long we stayed there. He left me in the room and left first. Do not know how long we were there after Sallie left; maybe fifteen or twenty minutes. He kept trying to persuade me that it was not wrong. I noticed a dampness on my person, which was blood, just above my knees. At that time I thought it was from him, but learned afterwards that it was from me; from my monthly period; had only one period before that; one or two months before. Dr. Warren said he was going down in town when he left the room. He told me in the room that, as I was coming from the schoolhouse, he thought I had stopped and was going back, and that if I had done so he would have gotten the razor and killed himself. I had stopped to pick up a slate pencil. Do not remember when it was he said that. I was born April 16, 1882. I saw defendant when he came back to the house after going down in town. I was playing on the organ. He came into the room and asked me what made me get so excited. I said, I have enough to excite me. He said, let's sing something. I went ahead and played the piece and he sang. Mrs. McElroy came. I did not sing while Dr. Warren was singing. Mrs. Warren then came. I did not return to school that afternoon, as school had turned out by the time all this occurred. Mrs. McElroy did not stay there long. She was in the room when Mrs. Warren came. I did not tell Mrs. McElroy what had happened. Started to tell Mrs. Warren the next day when she and Dr. Warren were fixing to leave. I asked her what she was going away for, and she told me I would know what it was over some day; told me they were going to her sister's at Eudora. Have not seen Dr. Warren since. It was Saturday when they left. There was a lady there at the house after they left. She lived about three miles from Bullard. I stayed there at Dr. Warren's house until 2 or 3 o'clock Saturday evening, when Mr. Bullard came after me and carried me home. Dr. Warren had never made any indecent proposition to me before Friday in Mrs. Warren's room; had given me advice; told me to watch the young men; told me in the room that Friday that he had seen a large crowd out swinging, and saw up to my knees. I did not tell anybody what had occurred until I saw my father, and I told him after I was carried home. Did not go home until 2 or 3 o'clock Saturday, because I had no way. Did not think the law would hurt him if he killed Dr. Warren. When I went into the parlor to play on the organ I set a chair against the door to keep Dr. Warren out. There was no lock on the door, and he pushed the door open and came in, after he came back. All that Dr. Warren did to me in Mrs. Warren's room was against my consent."

On cross-examination she testified as to what occurred between them as follows: "When I came over to Dr. Warren's house, I went into Mrs. Warren's room; did not see anybody in there when I went in, and came out and pulled the door to behind me. Dr. Warren was in the door of the opposite room. He spoke to me. I asked him where Mrs. Warren was. He said, she is in there. I said, no, she is not. I did not say anything else. He then came close to where I was. I was about two feet from the door when he took hold of my arm and carried me into the same room that I had come out of. There were two beds in that room; one on one side of the door and the other on the other side of the door that goes into Mrs. Warren's room from the hall. The bed he sat me down on was the one usually occupied by him and his wife, and the other one was the one I occupied. That bed sat over against the front wall of the house; it was up against the east wall; there was a window right opposite that bed. The curtains were up; the windows were down. The curtains were from across the window; they were tucked up to one side. All the curtains and windows were in that condition. I told him that he had better close all of the curtains. I don't know which one he closed. I meant the curtains of all the windows. There were four windows to that room. I don't know whether he closed the curtains of the windows looking towards the schoolhouse. I do not know whether he closed the windows; I did not see. He got up and went to the windows, but I do not know whether he closed them. I started out, and just as I caught the door knob he caught me and carried me back and sat me down on the same bed. Just as he sat me down again, Sallie opened the door. After Sallie left I did not notice whether the curtains were open or not. * * * I did not hear Sallie when she stepped up on the porch. The door was not locked when she came. She looked over towards the bed where we were. She was not over three steps from us. The door opened inside, toward Mrs. Warren's; toward the east. Am certain of this. That is, the right of this door into Mrs. Warren's room as you go in. The door would strike the bed as it opened. The bed would stop the door. Don't know exactly how far it would stand open. The bed was close to the hall wall. I guess it lacked about a foot and a half of touching the wall. Sallie, in opening the door in order to see us, poked her head around the door, showing her head and shoulders. She opened the door just enough to get her head and shoulders in. She said nothing; did not speak to me or to Dr. Warren, and I said nothing to her; Dr. Warren said nothing to her. I do not know where she went to. I do not remember to have heard her going out the front way. There was a gate that went out to the crib, and a way of getting outside through the lot gate. Do not remember whether I heard her going out. We sat in there and talked after she left. Sallie closed the door and he got up and thumb-latched the door, holding me while he did so. He was persuading me all that time. I do not know how long we stayed there after Sallie left. I could not say at all how long it was. Don't know how long we were there together. It was between 1 and 2

o'clock when I went down there and I went when he sent for me. It was between 1 and 2 when he sent for me. School was taken up between 1 and 2; think the usual school hour was half-past 1, but they hardly ever took up at that hour. When Marvin came after me it was between 1 and 2. I had been back there between fifteen and twenty minutes. Twelve o'clock was the usual time for going to dinner. Don't know how long I was in there with Dr. Warren. Do not know how long after Sallie left before he got up and opened the door and left. He left me on the bed and said he was going down in town. I went right on out when he left. I went into the other room where the organ was. I did not look at him and do not know where he went to; he said he was going down in town. I did not see him until about a half hour afterwards, and when I saw him again I was in the other room playing on the organ. There was a bed in that room. I did not go out of the house; only crossed the hall. When he came back, the door was fastened with a chair, and he came in and asked me what made me look so excited. I said I thought I had enough to excite me, and he said something about let's sing something; do not know whether he got a book or not. I think he sang soprano. I did not play any more after Mrs. McElroy came. We had got through with the song when she came. She sat down. I did not play any more while she was there. I had no conversation with her, but he did. I may have spoken a few words, but had no conversation with her. She and the doctor were talking; I was sitting in there. I sat on a chair at the organ, and, after awhile got up and went out and washed my face and went back and went to the dresser and started to arrange my hair, and saw Mrs. Warren coming. She was coming up from towards Mrs. Dill's. I went out in the hall and went back into the room I came out of. I went out into the hall just to see her drive up. I then went back into the room, finished combing my hair. Mrs. Warren came into that room. Mrs. McElroy was sitting there and they started up a conversation again. After Mrs. Warren came in, I went out and left them; just walking about over the house. When I came back in there, they were still talking. Don't know how long before Mrs. McElroy left. She left that afternoon. I remember of nobody else coming in that afternoon. I had no particular conversation with Mrs. Warren. We all ate supper. Think that Hays Long and Walter Scott were there for supper. The other members of the family who usually stayed there were there. We usually sat up an hour or two if any one came down. Do not remember when the doctor went to bed that night. Myself and Osie, the doctor and Mrs. Warren, all slept in that room. I do not remember any particular conversation that evening. Dr. Warren went to bed first and appeared to be drinking. He acted like it. He had been drinking, off and on, a good deal. I do not know whether I told him he was drunk that evening. He appeared like he was drunk. I do not remember that I smelt his breath. He acted very curiously and appeared to be drinking. He retired first. After he went to bed, I do not know how long Mrs Warren and I sat up; do not remember anything about Mrs.

Warren and myself that evening. When we sat up, we would sit up in the same room we slept in. I do not remember that we had any music that evening. Mrs. Warren plays and sings. Do not remember how long it was after Dr. Warren went to bed before we went to bed. I did not say anything to Mrs. Warren about how I had been treated that evening. I did not say anything to Mrs. McElroy about it. That was Friday. We had preaching Saturday. We had certain Sundays that the preacher preached. The church was not in sight of Dr. Warren's. They had preached there that Saturday; do not remember who preached; I did not go; they went from the house; it was 11 o'clock. They did not leave me with anyone. They took Osie. Mrs. Gayden went with them. I remained at the house all morning. I suppose we got up at the usual time. We had breakfast. Mrs. Warren got dinner and left me to attend to it. I sometimes helped Mrs. Warren in the kitchen, and she sometimes asked me to look after things about the house. That Saturday she put the dinner on and I go it ready. They did not eat dinner that day, and Dr. Warren left soon after they got back from church. It was 1 o'clock when they came back. I did not see Sallie that day. Do not remember whether Dr. Warren came in the house when they came back from church. They went to church in a buggy; they went in Mrs. Gayden's buggy. After they came back from church, Mrs. Warren came in the house; I was in the house. She was packing up her things. I asked her where she was going. She said she was going down to see her sick sister at Eudora. When she got ready to leave she told me good-by, and said she guessed I would know what all this was over some day. I told her that I knew, and she told me to hush, and she got her things and went out to the buggy.    *    *    *

Q. "Detail everything that occurred and that was said, from the time Marvin Cole came over to the schoolhouse after you, until he left the room and went down in town."

A. "Well, Marvin came over there after me and said that Mrs. Warren said to some home, right home, she wanted to see me; and when I got there I went in her room, and when I came out, Dr. Warren was standing in the door of the opposite room. I asked him where she was. He said, she is here. I started back; he caught me by the arm and took me in the room. I could not tell all that was said, word by word. He said that anything of that kind was not any harm. I told him that it was, and he tried to persuade me and could not do that, and he tried to push me over on the bed, and I told him to quit, and if he would not, shut down the windows, and when he got up to do so I ran, and just as I caught the door knob he caught me, and just then Sallie came to the door and asked where Aunt Willie was; I don't know whether anyone answered her or not. He kept me in there some time and kept trying to persuade me, and finally got up and said he was going down in town and opened the door and went out. It was before Sallie poked her head in at the door that he put his hand on my person. All this occurred in Smith County, and the State of Texas, on the 6th day of March, 1896."

No further statement is necessary.

The charge of the court (omitting formal matters) as given to the jury was as follows:

"Rape is defined by law, among other things, as 'the carnal knowledge of a female under the age of fifteen years, other than the wife of the person, with or without her consent, and with or without the use of force, threats, or fraud.'

"The charge of rape included the offense of attempt to commit rape.

"If the jury believe, from the evidence, beyond a reasonable doubt, that Belle Beauchamp was, on the day alleged below, under 15 years of age, then you will not further consider whether or not she was willing and consenting to the carnal intercourse with defendant, or whether or not force, threats, or fraud was used by defendant; but in addition thereto, if you further find, beyond a reasonable doubt, that defendant, Dr. R. B. Warren, in the county of Smith and State of Texas, on the 7th day of March, 1896, and prior to the filing of the indictment herein, did attempt to have carnal knowledge of said Belle Beauchamp, then you will find the defendant guilty of an attempt to commit a rape, and will assess his punishment at confinement in the penitentiary for any term of years not less that two."

The refused special requested instructions for defendant are as follows:

1. "You are further charged, that if defendant did not intend to have carnal connection with the prosecutrix except by her consent, and that he used no force, but only fondled her and felt of her person, without any intent to have carnal intercourse by force or without her consent, then you will acquit the defendant."

2. "You are charged that if you believe from the evidence that the defendant did not intend to have carnal connection with the prosecutrix, except by her consent, and that he did not use nor intend to use force to accomplish his purpose, and that he did not rape the prosecutrix, then you will not find him guilty of either assault to rape or an attempt to commit rape."

3. "You are charged, that in order to find the prisoner guilty of an assault with intent to commit rape, you must be satisfied beyond a reasonable doubt that the prisoner, when he laid hold of the prosecutrix, desired not only to gratify his passion upon her person, but that he intended to do so at all events, and notwithstanding any resistance on her part."

4. "You are further charged, that before you can convict the defendant of an attempt to commit rape, you must believe from the evidence beyond a reasonable doubt that he sought to have carnal connection with the prosecutrix by the use of force, but not such force as to bring the offense within the definition of an assault with intent to commit rape as defined in the main charge, and if you should not believe such force was used, then you will acquit the defendant, or find him guilty of aggra-

vated assault, in case you find that the offense, if any, comes within the definition of that offense as defined in the main charge."

5. "If you believe from the evidence that the defendant did assault the said Belle Beauchamp, but you do not believe beyond a reasonable doubt that he, under the circumstances, and at the time and place, intended to have carnal knowledge of her at all events, and notwithstanding resistance on her part, then you will acquit the defendant of the charge of the assault with intent to commit rape."

*Duncan & Jones,* for appellant.—The assigned errors, from 2 to 12 inclusive, will be considered together, and are as follows:

2. The court erred in charging the jury that the consent or want of consent of the prosecutrix should not be considered by them in determining the question of attempt to rape, if the prosecutrix was under 15 years of age at the time of the attempt.

3. The court erred in charging the jury that neither force, threats, nor fraud need be shown to establish the charge of attempt to rape, if the prosecutrix was under 15 years of age at the time of such attempt.

4. The court erred in its charge to the jury in failing to define the crime of attempt to commit rape, either in the terms of the statute or as used in ordinary language, and in authorizing the jury by the charge to find the defendant guilty of attempt to rape, if he simply asked or endeavored to persuade the prosecutrix to have intercourse with him.

5. The court erred in failing to define attempt to rape as defined in article 640 of the Penal Code. That is to say, in failing to charge that if the jury believed beyond a reasonable doubt that a rape, though not committed, was attempted by the use of force, but not such as to bring the offense within the definition of assault with intent to commit rape, then the jury might find the defendant guilty of an attempt to rape.

6. The court erred in failing to charge the jury upon assault with intent to rape, as the force necessary to constitute that offense is necessary to be defined to and be considered by the jury in determining as to whether the force actually used, if any, would come within the definition of the force necessary to be proven to establish an attempt to rape.

7. The court erred in charging the jury, in substance and effect, to find the defendant guilty of attempt to rape.

8. The court erred in its refusal to give defendant's requested charges from 1 to 5 inclusive. Penal Code, arts. 634-636 and art. 640; Castillo v. State, 29 Texas Crim. App., 127; McAdoo v. State, 35 Texas Crim. Rep., 603.

The court erred in its charge to the jury in failing to define attempt, either in the language of the statute or as used in common language; thus authorizing the jury to convict of attempt to rape, if defendant had indicated by word or deed a desire to have carnal intercourse with the prosecutrix, or had made the slightest effort, by request or otherwise, to gain her consent thereto. Code Crim. Proc., arts. 714, 715; Penal Code, arts. 1, 3, 9.

The court erred in overruling defendant's motion for new trial, as made, upon the ground that the verdict of the jury was contrary to the evidence, in that the evidence showed nothing more than improper and lascivious conduct towards the prosecutrix on the part of the defendant.

Defendant merely endeavored to persuade the prosecutrix to submit to him, or, as she expresses it: "He pushed me over into a sitting position on the side of the bed; then he sat down by me and talked to me; kept talking to me; told me it was not wrong, and kinder felt of me. He kept trying to persuade me that it was not wrong," etc. Defendant did not expose his own person, or even unbutton his pants, and merely fondled and felt of the person of the prosecutrix; finally voluntarily desisted, left the room and house, saying to the prosecutrix he was going down in town. She remained at the house; went into the room across the hall, and was playing on the organ when he returned a half hour later. She then played an accompaniment to him while he sang, and altogether conducted herself that afternoon, that night, and the next day as though nothing extraordinary had happened, saying nothing to anyone in regard to the affair. McAdoo v. State, 35 Texas Crim. Rep., 603; Bozeman v. State, 34 Texas Crim. Rep., 503; Allen v. State, 36 Texas Crim. Rep., 381; Callison v. State, 37 Texas Crim. Rep., 211; Robertson v. State, 30 Texas Crim. App., 498; Marthall v. State, 34 Texas Crim. Rep., 22; Mitchell v. State, 33 Texas Crim. Rep., 575; 9 Texas Crim. App., 53, 137; 567; 12 Texas Crim. App., 194; 15 Texas Crim. App., 275; 17 Texas Crim. App., 565; 22 Texas Crim. App., 529; 24 Texas Crim. App., 366; 28 Texas Crim. App., 227; 30 Texas Crim. App., 662; 32 Texas Crim. Rep., 298; 34 Texas Crim. Rep., 26, 479; 34 S. W. Rep., 281; 10 Texas Crim. App., 552; 14 Texas Crim. App., 162; 16 Texas Crim. App., 535; 18 Texas Crim. App., 485; 23 Texas Crim. App., 73; 27 Texas Crim. App., 317, 330; 29 Texas Crim. App., 241; 31 Texas Crim. Rep., 371; 33 Texas Crim. Rep., 65, 385, 412; 29 S. W. Rep., 1078.

*John M. Duncan*, for appellant, also filed an able written argument in support of the propositions stated in his brief.

*Mann Trice*, Assistant Attorney-General, for the State.—Force is not a necessary element of an attempt to rape a female under the age of 15 years. Carnal knowledge of such female is per se rape, whether with or without consent. This conclusion necessarily follows from the language of the statute defining the offense; that is, "The carnal knowledge of a female under the age of 15 years (other than the wife of the person) with or without her consent, and with or without the use of force, threats or fraud." Penal Code, art. 633.

It has been repeatedly held that "this offense has elements which do not constitute a technical assault." Melton v. State, 24 Texas Crim. App., 286; Williams v. State, 1 Texas Crim. App., 90; Burney v. State, 21 Texas Crim. App., 565; Moore v. State, 20 Texas Crim. App., 275. At- tempt to rape is a substantive offense for which indictment may be found

and conviction had. Reagan v. State, 28 Texas Crim. App., 227; Franklin v. State, 34 Texas Crim. Rep., 203.

It is uniformly held that where the offense is against a female under the age of consent, it is not necessary to negative the consent or aver that force, threats, or fraud were used. 1 Whart. Prec. Indict., 189, et seq.; 1 Bish. Crim. Proc., sec. 481.

Therefore sexual intercourse with a female under the age of consent constitutes rape, without reference to whether she consented or whether force, threats, or fraud were used to effect the purpose. Anschicks v. State, 6 Texas Crim. App., 525; Mayo v. State, 7 Texas Crim. App., 342; Callison v. State, 37 Texas Crim. Rep., 211.

The question is, "did the defendant at the time have the ulterior purpose of committing a rape, that is, of penetrating the female organ with his male member? If he had this purpose, the female being under the age of consent, it would be rape." Allen v. State, 36 Texas Crim. Rep., 381. Did this defendant have the ulterior purpose of having carnal intercourse with Belle Beauchamp; if so, he is guilty of an attempt to commit the offense of rape. The definition of attempt to commit rape is perfect and complete. The court, after instructing that the jury must believe from the evidence beyond a reasonable doubt that Belle Beauchamp was on the day alleged under the age of 15 years, further said, if he "did attempt to have carnal knowledge of said Belle Beauchamp, then you will find defendant guilty of an attempt to commit rape." This sets forth the gist and constituent elements of the offense.

There was no evidence suggesting the special instructions in the line that if the appellant simply intended to fondle the female, he could not be guilty of assault to rape or attempt to rape. This also rendered it unnecessary to charge on aggravated or simple assault.

The uncontradicted evidence shows that the female was under the age of consent, and that appellant attempted to have carnal intercourse with her, that is, sought to have such intercourse. There is no evidence suggesting any other purpose. Therefore the argument of appellant on this line is without support in the evidence.

HURT, PRESIDING JUDGE.—Appellant was convicted of an attempt to commit a rape upon Belle Beauchamp, and his punishment assessed at seven years in the penitentiary; hence this appeal.

There are two counts in the indictment. The count which charges the rape alleges that Belle Beauchamp was under the age of 15 years. The second count is for assault with intent to rape Belle Beauchamp, it not being alleged that the assaulted party, Belle Beauchamp, was under the age of fifteen years. The assault is alleged to have been made with force, threats, and fraud, and without the consent of Belle Beauchamp. After the testimony was introduced, the court instructed the jury as follows: "Rape is defined by law, among other things, 'as the carnal knowledge of a female under the age of 15 years, other than the wife

of the person, with or without her consent, and with or without the use
of force, threats, or fraud.' The charge of rape included the offense of
an attempt to commit rape. If the jury believe from the evidence be-
yond a reasonable doubt that Belle Beauchamp was, on the day alleged
below, under 15 years of age, then you will not further consider whether
or not she was willing and consenting to carnal intercourse with de-
fendant, or whether or not force, threats, or fraud was used by defendant;
but if, in addition thereto, you further find, beyond a reasonable doubt,
that defendant Dr. R. B. Warren, in the county of Smith, and State of
Texas, on the 7th day of March, 1896, and prior to the filing of the in-
dictment herein, did attempt to have carnal knowledge of said Belle
Beauchamp, then you will find the defendant guilty of an attempt to
commit a rape, and will assess his punishment at confinement in the
penitentiary for any term of years, not less than two." Counsel for ap-
pellant requested the court to instruct the jury as follows: "You are
further charged, that before you can convict the defendant of an at-
tempt to commit rape you must believe from the evidence, beyond a rea-
sonable doubt, that he sought to have carnal connection with the prose-
cutrix by the use of force, but not such force as to bring the offense
within the definition of an assault with intent to commit rape, as defined
in the main charge, and if you should not believe such force was used,
then you will acquit the defendant, or find him guilty of aggravated
assault, in case you find that the offense, if any, comes within the defini-
tion of that offense, as defined in the main charge." This instruction
was refused by the court.

Appellant was convicted of an attempt to rape the prosecutrix. Coun-
sel for appellant complains of the charge of the court given, and also in-
sists that the requested instruction should have been given. We must
test the charge of the court by the law of the case. At common law a
party could be convicted for an attempt to commit a felony, the punish-
ment being fixed either by common law or by act of parliament, graded
by the character of the offense attempted. Article 3 of our Penal Code
of 1895 provides: "In order that the system of penal laws in force in this
State may be complete within itself, and that no system of foreign laws,
written or unwritten, may be appealed to, it is declared that no person
shall be punished for any act or omission, unless the same is made a penal
offense and the penalty affixed thereto by the written law of this State."
Article 1 provides that "the design of enacting this Code is to define in
plain language every offense against the laws of this State, and affix
to each offense its proper punishment." It has done so. We have no
law in this State providing or declaring in these words "that an attempt
to commit rape is an offense." If we had such an act, merely declaring
that an attempt to commit rape would be an offense, with the punish-
ment affixed thereto, we might then conclude that if a party was guilty
of attempting to have carnal knowledge of a girl under 15 years of age,
with her consent, that, as the consummated crime would be rape, there-
fore he would be guilty of an attempt to commit rape. But we have no

such act. Therefore appellant must be convicted under the law as we find it written. What is the law? Article 640 provides: "If it appear on the trial of an indictment for rape, that the offense, though not committed, was attempted by the use of any of the means spoken of in articles 634, 635, and 636, but not such as to bring the offense within the definition of an assault with intent to commit rape, the jury may find the defendant guilty of an attempt to commit the offense, and affix the punishment prescribed in article 608," which is "confinement in the penitentiary for any term of years not less than two." Article 640 draws a distinction between an attempt to commit rape and an assault with intent to commit rape. It is not necessary for us in this opinion to point out the difference between the two offenses. Suffice it to say that the statute makes the difference. Now, to constitute this offense, an attempt to rape must be shown; and this attempt must be made by the use of one of the means spoken of in articles 634, 635, and 636. There were no threats or fraud used in this case, and therefore the State was forced to establish the fact that the attempt was made by the use of force—that force defined in article 634. Said article reads as follows: "The definition of 'force' as applicable to assault and battery applies also to the crime of rape, and it must have been such as might reasonably be supposed sufficient to overcome resistance, taking into consideration the relative strength, and all other circumstances of the case." No person in this State can be guilty of an attempt to commit rape, unless the proof shows that an attempt was made by the use of force, and the force intended to be used must be reasonably calculated to overcome resistance, taking into consideration the relative strength of the parties and other circumstances of the case. It must appear that it was reasonably sufficient to overcome resistance. A proper construction of this statute in connection with article 640 is that at the time of the alleged attempt it was the intention of the party to use the same force as would make him guilty of rape, or of assault to commit rape, but in the actual attempt he fell short of the use or application of such force as would bring the offense up to an assault with intent to rape, for when the force used amounts to an assault then it ceases to be a mere attempt, but would be an assault to commit rape; then the two offenses come together; when the attempt ceases, the assault begins and takes its place. And if the force actually used is such as to constitute the offense an assault with intent to commit rape, then it is no longer a mere attempt. The fact that the party was under 15 years of age has nothing to do with this question. To constitute this offense, as we have said, the attempt must be made, and the intention to use that character of force above described must also be established by the proof. As we have said above, our statute does not stop by stating that you can punish an attempt to commit rape, but it specifically points out the manner, method, and means which must be intended to be used by the accused in order to constitute this offense. If the statute was general, and did not specifically point out and require that the party must intend to use force, such

as is defined in article 634, we might then conclude that what was done by the accused in this case was an attempt to commit rape, because, as we have said above, rape can be accomplished on a girl under 15 years of age with her consent. But our statute is particular in regard to this matter, and requires that the proof must show that the defendant intended to use that particular force which is defined in article 634. To these acts and intentions our Code has affixed a penalty. This offense is called an attempt to commit rape. This offense has been defined and the punishment affixed, and we know of no other attempt to commit rape, except as named in article 640. The charge of the court was radically wrong. It did not require the accused to intend to use any character of force. The law requires that he should intend to use that character of force which was reasonably calculated to overcome resistance. This presupposes that she was not consenting. She could not, at the same time, resist and consent. We are not treating of an assault to rape a girl under the age of 15 years.

*Reversed and remanded.*

DAVIDSON, Judge, concurs.

HENDERSON, JUDGE.—I am not prepared to agree with some of the reasoning of a majority of the court. However, I agree to the result. As I understand the evidence, this showed that appellant was not guilty of a mere attempt, but, if guilty of anything, it was an assault with intent to commit the offense charged; and I do not believe that the facts and circumstances in proof authorized the learned judge to submit an attempt to commit a rape at all. At any rate, if he undertook to submit an attempt to commit a rape on the person of the prosecutrix, he should have instructed the jury what constituted such attempt, and have further instructed them what constituted an assault with intent to rape, and in that connection should have informed the jury that, if the action of the defendant constituted an assault with intent to rape, they could not convict the defendant of an attempt to commit rape. For the failure to so instruct the jury, I believe the judgment of the lower court should be reversed, and the cause remanded.